2008 ME 167

**Randall K. TUCKER**

v.

**ASSOCIATED GROCERS OF
MAINE, INC., et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 16, 2008.
Decided: Nov. 6, 2008.

Cara A. Lovejoy, Esq. (orally), Robinson, Kriger & McCallum, Twelve Portland, ME, for Associated Grocers of Maine, Inc.

Wayne W. Whitney, Esq. (orally), McTeague Higbee Case Cohen Whitney & Toker, Topsham, ME, for Randall K. Tucker.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, MEAD, and GORMAN, JJ.

Concurrence: LEVY, and SILVER, JJ.

GORMAN, J.

[¶ 1] Associated Grocers of Maine, Inc., (AGM) appeals from a decision of a Workers' Compensation Board hearing officer (*Elwin, HO* ) granting Randall K. Tucker's petition for review. AGM contends that the hearing officer erred in awarding Tucker 100% partial benefits and ongoing partial benefits based on part-time earning capacity because, although Tucker has full-time, light duty earning capacity, he elected to attend school on a full-time basis and seek only part-time work. We agree, and vacate the hearing officer's decision.

## I. BACKGROUND

[¶ 2] Randall Tucker worked for AGM as a truck driver and warehouse clerk for eight years. On May 29, 2002, he suffered an injury to his lower back while unloading a shipment of groceries. After a period of total incapacity, Tucker worked full time for AGM at a light duty job, and was paid partial incapacity benefits pursuant to a 2005 consent decree. Tucker's doctor took him out of work on June 13, 2005. AGM terminated Tucker's employment three months later, because it could no longer accommodate his injury. By October 2005, Tucker had found new, part-time employment as a meat cutter for a new employer, where he worked between ten and twenty-five hours per week. His new partial benefit was established in a consent decree dated March 6, 2006.

[¶ 3] After his work-related injury, Tucker returned to school and obtained his high school diploma. In January 2006, he began a full-time course of study at a community college working toward an associate's degree in respiratory therapy. He has maintained a full course load since that time, which involves twenty-four hours of classes and twenty hours of out-

side study per week. Tucker intended to work twenty hours per week while completing his degree. However, Tucker's part-time meat cutting job ended on February 25, 2006, nine days before the March 6, 2006, consent decree was signed. Tucker proceeded to search for work consistent with his restrictions and his class schedule. He was unsuccessful until March 29, 2007, when he found another part-time meat cutting job earning $11 per hour.

[¶ 4] Tucker filed a petition for review of incapacity, seeking 100% partial benefits beginning the day after the March 6, 2006, consent decree was signed until he secured part-time work on March 29, 2007,[1] and ongoing partial benefits thereafter. The hearing officer found that Tucker's financial circumstances had changed since the 2006 consent decree, and granted the petition awarding 100% partial benefits for the closed-end period sought, and ongoing partial benefits thereafter. Tucker's 2002 average weekly wage was $725.23 plus $202.90 in fringe benefits, yielding a 100% partial benefit of $520.12. Taking into account his part-time earnings, he was awarded an ongoing partial benefit in the amount of $349.46 per week.

[¶ 5] AGM filed a petition for additional findings of fact and conclusions of law along with proposed findings and conclusions. The hearing officer determined that the decision provided an adequate basis for appellate review, and she did not issue additional findings. We granted AGM's petition for appellate review pursuant to 39–A M.R.S. § 322 (2007) and M.R.App. P. 23(c).

## II. DISCUSSION

[¶ 6] We are asked to decide whether an injured employee with full-time light duty earning capacity has met his burden of proof of entitlement to 100% partial incapacity benefits for a closed-end period and ongoing partial benefits based on part-time earning capacity when the employee concedes that he searched for only part-time work so that he could complete a full-time course of study and improve his employment prospects. Preliminarily, we are asked to consider whether the hearing officer erred when determining that the employee's economic circumstances had changed since the prior decree establishing the employer's benefit obligation.

[¶ 7] Our role on appeal is limited to assuring that the hearing officer's decision involved no misconception of applicable law and that the application of the law to the facts was neither arbitrary nor without rational foundation. *Moore v. Pratt & Whitney Aircraft*, 669 A.2d 156, 158 (Me. 1995); *see also Longtin v. City of Lewiston*, 1998 ME 90, ¶ 11, 710 A.2d 901, 904–05.

### A. Changed Circumstances

[¶ 8] Tucker's partial benefit was established in the March 6, 2006, consent decree. "[I]n order to prevail on a petition to increase or decrease compensation in a workers' compensation case when a benefit level has been established by a previous decision, the petitioning party must first meet its burden to show a 'change of circumstances' since the prior determination." *Grubb v. S.D. Warren Co.*, 2003 ME 139, ¶ 7, 837 A.2d 117, 119–20. That burden "maybe met by either providing 'comparative medical evidence,' or by showing changed economic circumstances." *Id.*

---

1. Excluded from this time period are the weeks between April 26 and June 12, 2006, when Tucker was paid total incapacity benefits for a period of time when he was recuperating from shoulder surgery necessitated by a 2001 work injury that is not in issue in this appeal.

[¶ 9]   AGM contends that the hearing officer erred when finding changed economic circumstances because Tucker's job loss occurred before the consent decree was signed, thus his circumstances had not changed *since the prior determination.* *See id.*   The hearing officer, however, found that Tucker's economic circumstances had changed not only due to the job loss, but also due to the unanticipated, year-long period of unemployment that followed.   This assessment of Tucker's circumstances is supported by the record, is not irrational, and does not misconceive the law.   Accordingly, we find no error.

[¶ 10]   Having found that the hearing officer appropriately re-examined Tucker's benefit level, we proceed to determine whether she erred when awarding 100% partial benefits for the period when Tucker was between part-time jobs, and ongoing partial benefits based on a part-time earning capacity thereafter.

### B.   100% Partial Benefits and Post–Injury Earning Capacity

■ [¶ 11]   Partial incapacity benefits are based on the difference between the employee's pre-injury average weekly wage and what the employee is able to earn after the injury.   39–A M.R.S. §§ 213(1), 214(1)(B) (2007).   Section 213(1) provides in relevant part:

> While the incapacity for work is partial, the employer shall pay the injured employee a weekly compensation equal to 80% of the difference between the injured employee's after-tax average weekly wage before the personal injury and the after-tax average weekly wage that the injured employee is *able to earn* after the injury, but not more than the maximum benefit under section 211.

(Emphasis added.)   Section 214(1)(B) provides:

> If an employee is employed at any job and the average weekly wage of the employee is less than that which the employee received before the date of injury, the employee is entitled to receive weekly benefits under this Act equal to 80% of the difference between the injured employee's after-tax weekly wage before the date of injury and the after-tax weekly wage that the injured employee *is able to earn* after the date of injury, but not more than the maximum weekly rate of compensation, as determined under section 211.

(Emphasis added.)   Pursuant to these provisions, when awarding partial benefits, the hearing officer has an obligation to determine the employee's capacity to earn. *Johnson v. Shaw's Distribution Ctr.,* 2000 ME 191, ¶ 8, 760 A.2d 1057, 1060.   Earning capacity is evaluated "based on (1) the employee's physical capacity to earn wages, and (2) the availability of work within the employee's physical limitations." *Dumond v. Aroostook Van Lines,* 670 A.2d 939, 941 (Me.1996).

■ [¶ 12]   "A partially incapacitated employee may be entitled to '100% partial' benefits pursuant to section 213 based on the combination of a partially incapacitating work injury and the loss of employment opportunities that are attributable to that injury." *Monaghan v. Jordan's Meats,* 2007 ME 100, ¶ 13, 928 A.2d 786, 791.   To obtain the 100% benefit pursuant to an employee's petition for review, the employee must establish that employment is unavailable to him in his local community as a result of the work injury.   *Id.*

[¶ 13]   AGM contends that Tucker is not entitled to 100% partial benefits because he chose to enroll in school full time and search for only part-time work in order to accommodate that choice, despite having full-time earning capacity.   AGM further contends that the ongoing partial

benefit amount Tucker was awarded, calculated based on a full-time average weekly wage less his part-time earnings, was erroneous because Tucker has full-time post-injury earning capacity.

[¶ 14] Tucker concedes that after he went back to school and he lost his job in February 2006—the time period relevant to his petition for review—he searched only for part-time work so that he could complete his course of study and improve his employment prospects. He asserts, however, that he initially enrolled in school because, despite an extensive search, he could not find full-time work within his restrictions. Because his inability to find work and his need for retraining are related to the work injury, he argues that it was proper for the hearing officer to conclude that work was unavailable to him.

[¶ 15] When concluding that Tucker had established that work was unavailable to him in his community as a result of his work injury, the hearing officer considered Tucker's enrollment in college not as an election to remove himself from the full-time work force, but as a factor relevant to whether he conducted a good faith work search. *See id.* ¶ 21, 928 A.2d at 793 (listing nine nonexclusive factors for consideration by hearing officers when determining whether work search evidence proves that work is unavailable to the employee in the local community as a result of the work injury, including whether the employee has engaged in efforts to improve his prospects for employment).

[¶ 16] AGM contends this is error because, by searching only for part-time work after he went back to school, Tucker *chose* underemployment—and an employer is not bound to subsidize that choice.

[¶ 17] We considered whether the Act authorizes an award of 100% partial incapacity benefits to an employee who had enrolled in graduate school full time according to a rehabilitation plan ordered pursuant to 39–A M.R.S. § 217 [2] in *Johnson*, 2000 ME 191, 760 A.2d 1057. The employee in *Johnson* had filed a petition for award, seeking 100% partial incapacity benefits for the period he would be enrolled in school, arguing that work was unavailable to him due to the rehabilitation plan. *Id.* ¶ 4, 760 A.2d at 1059.

[¶ 18] The hearing officer concluded that notwithstanding his full-time enrollment in school, Johnson had not demonstrated that work was unavailable to him as a result of his work injuries. *Id.* The hearing officer awarded partial benefits, but imputed a full-time post-injury earning capacity based on the minimum wage. *Id.* We affirmed, stating that there is nothing in the statute that would require modification of the traditional availability analysis under Johnson's circumstances. *Id.* ¶ 14, 760 A.2d at 1061. We reasoned that while the employer remained responsible for all benefits to which Johnson was entitled *as a result of his injuries* during his enrollment in school, the employer was not responsible for wage replacement for the hours of his studies. *Id.* ¶ 16. We stated:

It is important to understand exactly what the employee seeks here. The parties do not dispute that during a rehabilitation program, the employer will remain responsible for benefits to which the employee is entitled as a re-

---

2. AGM was not ordered to pay for rehabilitation or retraining services for Tucker pursuant to 39–A M.R.S. § 217 (2007). Section 217 provides, in relevant part:

When as a result of injury the employee is unable to perform work for which the em-

ployee has previous training or experience, the employee is entitled to such employment rehabilitation services, including retraining and job placement, as reasonably necessary to restore the employee to suitable employment.

sult of the reduction in his wages resulting from the injury. ᴗThe employee argues that, in addition to those benefits, he is entitled to benefits representing his lost earnings while he is engaged in the rehabilitation program. In essence, the employee asks us to declare that the employer is responsible for paying wage replacement to the employee for the hours of his studies. There simply exists no statutory authority for this proposition.

Those employees with severe or totally incapacitating injuries who are unable to perform available work in the local labor market, and those for whom there actually exists little or no available employment in the community, will continue to receive total or relatively high levels of partial incapacity benefits while pursuing vocational rehabilitation. Only those employees like Johnson, with lesser degrees of partial incapacity, who continue to have substantial work opportunities in their local communities without vocational rehabilitation, are affected by the statute as it is written.

*Id.* ¶¶ 16, 17. Thus, the employer is responsible for the loss of earnings resulting from the injury, not "from the employee's choice to remove himself from the labor market during his efforts to improve his future earning opportunities." *Id.* ¶ 17.

[¶ 19] Unlike the employee in *Johnson,* Tucker attempted to establish the unavailability of work with evidence of a work search. His attempt, however, fails as a matter of law. Tucker has acknowledged that he has the physical capacity to earn full-time wages, yet he admittedly sought only part-time work. While *Monaghan* lists efforts to improve employment prospects among the factors that are relevant to whether the employee had demonstrated a good faith work search, it does not authorize awarding 100% partial benefits (or partial benefits based on part-time earning capacity) when an employee with full-time work capacity searches for only part-time work so that he can maintain a full-time school schedule. Thus, the hearing officer misconceived the law.

[¶ 20] We conclude that because an employer is responsible only for loss of earning capacity related to the work injury, it is not required to pay 100% partial benefits or ongoing partial benefits based on a part-time earning capacity to an employee with full-time earning capacity who elects to attend school full time and work only part time. We vacate the hearing officer's decision and remand for recalculation of benefits imputing a full-time earning capacity to Tucker.

The entry is:

> The Workers' Compensation Board hearing officer's decision is vacated, and the case remanded for proceedings consistent with this opinion.

SILVER, J., with whom LEVY, J., joins, concurring.

[¶ 21] I concur in part B of the opinion, which addresses partial benefits and post-injury earning capacity, but I would vacate on other grounds and would remand for further fact-finding. I agree that Tucker, in order to qualify for 100% partial benefits, must demonstrate that he conducted an adequate search for full-time work because he has full-time, light duty earning capacity. The hearing officer made no findings of fact or conclusions of law regarding Tucker's search for full-time work in late 2005 and early 2006. I would remand for further fact-finding on this issue.

[¶ 22] An employee seeking 100% partial benefits must establish that he or she has a combination of (1) a partially incapacitating work injury, and (2) a loss, attributable to that injury, of employment opportunities within the employee's local

community. *Avramovic v. R.C. Moore Transp., Inc.,* 2008 ME 140, ¶ 16, 954 A.2d 449, 453; *Monaghan v. Jordan's Meats,* 2007 ME 100, ¶ 13, 928 A.2d 786, 791. Proof of a loss of employment opportunities within the employee's local community is governed by the judicially created "work search rule," which is "designed to allocate the order and presentation of proof related to the availability of work." *Monaghan,* 2007 ME 100, ¶ 14, 928 A.2d at 791.

[¶ 23] When, as here, the employee is the petitioning party, the employee has the ultimate burden of proof to demonstrate that work is unavailable, as a result of the work injury, within the employee's local community. *Id.* ¶ 14, 928 A.2d at 791. Proof is not limited to demonstrations of unsuccessful job searches; an employee may introduce any competent evidence to show the unavailability of work in the local community. *Id.* ¶ 16, 928 A.2d at 791.

[¶ 24] We have held that for a work search to be adequate as a matter of law, the employee must demonstrate that he or she undertook a reasonable exploration of the labor market in the local community, and that either no stable market exists for the work, or no opportunity exists for the employee due to a work-related injury. *Id.* ¶ 17, 928 A.2d at 792. Work search evidence should

> "give a rational person reasonable cause to believe that the work-related injury this particular worker sustained is preventing him from obtaining remunerative work 'ordinarily' available in the competitive labor market of his community. Such reasonable cause will arise where the worker's exploration of the labor market in his community discloses a number of search experiences manifesting a 'pattern', ... from which it becomes reasonable to infer either that a stable market for the kind of work the worker has regained some ability to per-

form does not exist in his community, or, if such a market does exist, that work will not be made available to this particular worker because of the persisting effects of the work-related injury he sustained."

*Id.* (quoting *Ibbitson v. Sheridan Corp.,* 422 A.2d 1005, 1011 (Me.1980)).

[¶ 25] We have held that the issue of adequacy of a work search is a mixed question of fact and law. *Id.* ¶ 18, 928 A.2d at 792. Findings regarding the employee's work search efforts are factual, but the evaluation of the reasonableness of those efforts is a mixed question involving the reasonableness and legality of the hearing officer's conclusion, with deference to his or her expertise. *Id.* We have identified several non-exclusive factors to serve as guideposts in the hearing officer's determination:

(1) The number of inquiries made or applications submitted by an employee;

(2) Whether the search was undertaken in good faith;

(3) Whether the search was too restrictive;

(4) Whether the search was limited solely to employers who were not advertising available positions, or whether the employee also made appropriate use of classified ads or other employment resources in the search;

(5) Whether the search was targeted to work that the employee is capable of performing;

(6) Whether the employee over-emphasized work restrictions when applying for jobs;

(7) Whether the employee engaged in other efforts to find employment or increase prospects for employment;

(8) The employee's personal characteristics such as age, training, education, and work history; and

(9) The size of the job market in the employee's geographic area.

*Id.* ¶ 21, 928 A.2d at 793. In the present case, the hearing officer appropriately took into account the full range of factors set forth in *Monaghan,* focusing particularly on Tucker's efforts to increase his prospects for employment by seeking further education.

[¶ 26] However, the time period considered by the hearing officer with respect to Tucker's job search appears to have been unnecessarily restricted to events after the March 2006 consent decree. The hearing officer was correct in considering that the date of the latest consent decree is normally the relevant starting date for events pertinent to determining whether a change in circumstances has occurred since the last determination. *See Grubb v. S.D. Warren Co.,* 2003 ME 139, ¶ 7, 837 A.2d 117, 119. Once it has been determined that there has been a change in circumstances, however, the focus of inquiry shifts to the work search and the broad range of factors set forth in *Monaghan.* 2007 ME 100, ¶ 21, 928 A.2d at 793. Consideration of those factors may require the hearing officer to look at a broader time frame.

[¶ 27] In the present case, it is not possible to gauge the adequacy of the work search efforts that Tucker made after the March 2006 consent decree without also considering those he made since autumn 2005. Tucker asserts that he enrolled in school in January 2006 precisely because he could not find full-time work within his restrictions prior to that, notwithstanding considerable effort. Tucker asserts that he searched for full-time work from November 2005 through January 2006. There is evidence in the record that he applied for about 300 jobs during that time, and that many of those may have been full-time jobs. AGM contests Tucker's assertion that he engaged in a search for full-time work during this period.

[¶ 28] Tucker's assertions about his job search over this time period are crucial to putting his subsequent actions, including his decision to return to school and his efforts to find part-time work, into context. The Court, focusing only on the period after the consent decree was signed, notes that Tucker's job search was directed exclusively at part-time jobs in order to accommodate his academic schedule. The Court characterizes this as Tucker's "choice." If, however, the time period over which Tucker's efforts were evaluated had included his earlier efforts, the hearing officer would have been able to make a finding as to whether the option of full-time work was a viable alternative. If full-time work was not an alternative, it would be inaccurate to characterize his decision to return to school as a choice.

[¶ 29] This case should be remanded for further fact-finding with respect to Tucker's work search. Although there is evidence in the record on this issue from which an inference could be made, AGM submitted proposed findings of fact and conclusions of law, and therefore this Court may not infer any findings on this issue:

> [W]hen there is a request for findings, ... we do not assume that the administrative agency made all the necessary findings to support its judgment. Instead, we review the original findings and any additional findings made in response to a motion for findings to determine if they are sufficient, as a matter of law, to support the result and if they are supported by evidence in the record.

*Maietta v. Town of Scarborough,* 2004 ME 97, ¶ 17, 854 A.2d 223, 228 (citation omitted). Because the hearing officer did not make any findings with respect to whether

Tucker made an adequate search for full-time work, the hearing officer's findings are insufficient as a matter of law to support her decision. The case should be remanded for further fact-finding on Tucker's work search, with a particular focus on the period from late 2005 to early 2006 and whether Tucker engaged in an adequate search for full-time work during that period.

[¶ 30] I concur in the remaining parts of the Court's opinion.